## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| DOUGLAS WRIGHT and SAM MENDENHALL (d/b/a MENDENHALL FARMS), individually and on behalf of others similarly situated, | ) ) ) ) ) | Case No. |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TYSON FOODS, INC.; TYSON FRESH MEATS, INC.; JBS S.A.; JBS USA FOOD COMPANY; SWIFT BEEF COMPANY; JBS PACKERLAND, INC.; CARGILL, INCORPORATED; CARGILL MEAT SOLUTIONS CORPORATION; MARFRIG GLOBAL FOODS S.A.; and NATIONAL BEEF PACKING COMPANY, LLC, | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Douglas Wright and Sam Mendenhall D/B/A Mendenhall Farms, on behalf of themselves and all those similarly situated, for their Complaint against Defendants state:

### NATURE OF THE CASE

1.  This case arises from Defendants' unlawful conspiracy to lower the prices they paid for fed cattle in violation of the Sherman Antitrust Act and the Commodities

1

Exchange Act. Plaintiffs are cattle farmers who sold fed cattle to one or more Defendants and/or who traded cattle futures contracts on the Chicago Mercantile Exchange (CME) and have been damaged by Defendants' anticompetitive and unlawful conduct.

2.   Beginning no later than January 2015 and continuing today Defendants conspired to suppress the price of fed cattle they purchased in the United States. Defendants' coordinated conduct, including slashing their respective slaughter volumes and curtailing their purchases of fed cattle in the cash cattle market, caused an unprecedented collapse in fed cattle prices in 2015. Defendants continued to suppress the price of fed cattle through coordinated procurement practices and periodic slaughter restraint. Defendants' conspiracy impacted both the physical fed cattle market and the market for live cattle futures and options traded on the CME.

3.   As middle-men in the supply chain, Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. Because the supply of fed cattle is insensitive to short-term price changes – owing to the long life cycle of fed cattle, their perishable nature, and their lack of any alternative use – and as beef demand is relatively insensitive to changes in price, the meat margin is very sensitive to changes in aggregate industry slaughter levels. Consequently, Defendants can increase their meat margin, and thus their profitability, by colluding to reduce their respective slaughter volumes, thereby depressing the price of fed cattle.

2

4.   Because Defendants have not passed on their illicitly-gained lower prices to their customers (indeed such a pass-through would defeat the purpose of Defendants' conspiracy) producers and end consumers both lose: producers are deprived of fair price competition at the top of the supply chain, and consumers are unlawfully overcharged at the bottom of the supply chain. The only parties that win are the large beef packers who use their collective market power to squeeze both producers and consumers. As the DOJ has noted, the Sherman Act was enacted to prevent such buying cartels:

> The 1890 debates in both houses of the United States Congress demonstrated concern with the exercise of market power on both the buying and selling sides of the market. Many legislators singled out large meat packers for condemnation, and they were condemned as much for reducing the prices paid to cattle farmers as for raising prices to consumers. In response, Congress passed the Sherman Act, aimed at preserving free and unfettered competition as the rule of trade. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.

> The Sherman Act prohibits anticompetitive agreements and exclusionary conduct and both may be found unlawful on the basis of effects on the buying side of the market. Buyer cartels are unlawful per se and prosecuted criminally….

> One of the earliest Sherman Act cases involved, among other things, a conspiracy among meat packers to reduce the price they paid for cattle.

Monopsony and Buyer Power, Note by the United States, at 245-46, available at https://www.oecd.org/daf/competition/44445750.pdf (internal quotations and citations omitted).

5.   Fed cattle are steers and heifers raised and fed for the production and sale of beef

products. Defendants are beef packers who purchase fed cattle from Plaintiff and the

Producer Class (defined below) for slaughter. Defendants then process the resulting

carcasses into beef for sale to other processors, wholesalers, and retail outlets, as depicted

below:

**Cattle and Beef Industry from Breeding to Consumption**



U.S. Gov't Accountability Off., GAO-18-296, U.S. Department of Agriculture: Additional

Data Analysis Could Enhance Monitoring of U.S.  Cattle Market (Apr. 2018) ("2018 GAO

Report"), at 6, https://www.gao.gov/assets/700/691178.pdf.

6.   Live cattle futures contracts are standardized contracts traded on the CME in which the contract buyer agrees to take delivery, from the seller, of a specific quantity of fed cattle, at a predetermined price on a future delivery date.

7.   Defendants control the U.S. market for the purchase of slaughter-weight fed cattle. Since 2011, Defendants have slaughtered over 80% of all fed cattle sold within the United States on an annual basis. The chart below demonstrates Defendants' overwhelming market share for the purchase of fed cattle.

**Defendants' Market Share of Annual U.S. Fed Cattle Slaughter Volumes**



Cattle   Buyers   Weekly,   "Steer   And   Heifer   Slaughter   Market   Share", http://www.cattlebuyersweekly.com/users/rankings/packerssteerheifer.php (subscription required).

8.   Defendants procure most of their fed cattle though alternative marketing agreements ("AMAs"), such as "formula" and "forward" contracts. Under these contracts, the producer agrees to deliver its cattle to a Defendant once they have reached slaughter-weight, at a price to be determined at or around the time of delivery. The price formulas used by formula contracts typically incorporate reported prices of fed cattle sold in the weekly cash cattle trade, the industry's spot market. The price formulas used by forward contracts incorporate live cattle futures prices, which, in turn, are directly impacted by reported cash cattle prices. As a result, the prices paid for fed cattle in the cash cattle trade – which constitute a minority of all fed cattle sold in the United States – determines the price of almost all fed cattle bought by Defendants.

9.   Fed cattle prices increased steadily between 2009 and 2014 in response to strong beef demand and a shortage of fed cattle following the droughts of 2011 through 2013. After prices peaked in November 2014, the industry expected the price of fed cattle to stabilize in 2015 and continue at or around that higher level for years.

10. This widely-predicted price stability did not occur. Instead, Defendants used their market power, price sensitivities, and the thin cash cattle trade to their advantage and conspired to depress fed cattle prices. Their conspiracy to reduce fed cattle prices, and thereby increase the meat margin, was carried out through at least the following coordinated conduct: (1) Defendants periodically reduced their slaughter volumes to reduce demand for fed cattle; (2) Defendants curtailed their purchase and slaughter of

cash cattle during those same periods; (3) Defendants coordinated their procurement practices for cash cattle; (4) Defendants imported foreign cattle at a loss so as to reduce domestic demand; and (5) Defendants, simultaneously, closed and idled plants.

11. Defendants' conspiracy caused an unprecedented collapse in fed cattle prices in the second half of 2015 and continued to suppress fed cattle prices thereafter.

12. Despite the drastic collapse in fed cattle prices caused by Defendants' conspiracy, Defendants continued to benefit from record beef prices. This disconnect allowed Defendants to reap record per-head anticompetitive meat margins at the expense of fed cattle producers who were paid below competitive market prices.

13. The market for purchase of fed cattle is highly conducive to collusion for multiple reasons: the small number of big market beef packers, high barriers to entry, and frequent, easily accessible means of communication among Defendants, including through the subscription-only service Express Markets. Defendants' field buyers had ample opportunity to meet and exchange commercially sensitive information with each other every week as they inspected feedlots within their respective territories. Field buyers routinely communicated "market color" obtained from the field – including reports of their competitors' activities obtained from producers – back to their head office and their firms' other field buyers through daily conference calls. Defendants were also members of various trade and industry organizations, which provided additional opportunities to conspire.

14. Defendants were also each other's customers, purchasing and selling each other's protein products. These transactions and intertwined business operations provide further opportunities to collude, share competitive information and police the supply restrictions and purchase boycotts described herein.

15. Trade records and economic evidence all confirm that Defendants expressly conspired to depress the price of fed cattle bought during the Class Period. Transactional data and slaughter volume reported by Defendants and published by the USDA all show the desired impact of Defendants' conspiracy.

16. The same data demonstrate that Defendants drastically reduced their purchases of cash cattle during these periods of slaughter restraint. Defendants restrained slaughter to create a glut of slaughter-ready cash cattle and coerce producers to take lower prices for their highly perishable product. Doing so not only dropped cash cattle prices, but also the prices paid under Defendants' formula and forward contracts. Once Defendants broke the cash cattle trade and created a relative supply glut, Defendants collectively ramped up their cash cattle purchases and reaped supra-competitive profits at the expense of producers.

17. In addition, Defendants also engaged in various collusive bidding practices that further unlawfully suppressed prices. Defendants enforced, through boycott threats, a "queuing protocol" that significantly limited cash cattle sellers' ability to generate price competition among Defendants. Defendants also typically conducted all, or substantially

8

all, of their weekly cash cattle purchasing during a short 30- to 60-minute window late on Fridays and would adhere to the price established by the Defendant that had opened the weekly cash cattle trade. Defendants' bidding practices differed from the practices of regional packers (a small percentage of the fed cattle purchasers), which bid on and purchased cash cattle throughout the week during the Class Period.

18. Defendants employed other procurement methods to depress the cash cattle price incorporated directly into their formula contracts and indirectly into their forward contracts. Import data show that Defendants imported large numbers of live cattle for slaughter from Canada and Mexico even after it became economically irrational for them to do so. Such conduct was not economically rational but for Defendants' agreement to curtail their domestic cash cattle purchases.

19. The economic facts further support the existence of the alleged conspiracy. Supply and demand drivers of fed cattle prices, and other commonly proffered explanations, do not explain the 2015 collapse in fed cattle prices. Rather, fed cattle prices have been artificially depressed by Defendants' collusive conduct every year since January 2015.

20. Because of Defendants' misconduct, Plaintiffs and other producers who sold fed cattle to Defendants (the "Producer Class") received significantly lower prices for their cattle than they would have in a competitive market, and purchasers of live cattle futures and options (the "Exchange Class"), including Plaintiffs Douglas Wright and Mendenhall Farms, suffered significant harm because of Defendants' misconduct.

PARTIES

## I.  Plaintiffs

21. Plaintiff Douglas Wright owns and operates a farming operation in Holt County, Nebraska. Mr. Wright has raised and sold varying amounts of cattle every year since 2015. Most of Plaintiff's sales of fed cattle since 2015 have been to defendant JBS.

22. Plaintiff Sam Mendenhall D/B/A Mendenhall Farms owns and operates a farming operation in Decatur County, Iowa. Mendenhall Farms has raised and sold various amounts of cattle every year since 2015. Most of Plaintiff's sales of fed cattle since 2015 have been to defendants Tyson and National Beef Packing Company. During the Class Period Plaintiff traded futures contracts for fed cattle on the CME to manage price risk associated with sales of his fed cattle.

## II.  Defendants

### A.  The Tyson Defendants.

23. Defendant Tyson Foods, Inc. ("Tyson Foods") is a Delaware corporation with its principal place of business in Springdale, Arkansas.

24. Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats" and collectively with Tyson Foods, "Tyson" or the "Tyson Defendants") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh Meats is a Delaware corporation with its principal place of business in Dakota Dunes, South Dakota.

25. During the Class Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

**B. The JBS Defendants.**

22. Defendant JBS S.A. ("JBS") is a Brazilian corporation with its principal place of business located in Sao Paulo, Brazil.

23. Defendant JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business in Greeley, Colorado.

24. Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business in Greeley, Colorado.

25. Defendant JBS Packerland, Inc. ("JBS Packerland") is a Delaware corporation with its principal place of business in Greeley, Colorado.

26. Defendants JBS USA, Swift, and JBS Packerland were, throughout the Class Period, wholly-owned, direct or indirect subsidiaries of JBS. Defendants JBS, JBS USA, Swift, and JBS Packerland are referred to collectively herein as the "JBS Defendants."

27. During the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

11

C.  **The Cargill Defendants.**

28. Defendant Cargill, Incorporated ("Cargill") is a Delaware corporation with its principal place of business in Wayzata, Minnesota.

29. Defendant Cargill Meat Solutions Corporation ("Cargill Meat" and, collectively with Cargill, the "Cargill Defendants"), a subsidiary of Cargill, is a Delaware corporation with its principal place of business in Wichita, Kansas.

30. During the Class Period, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of both Classes in the United States and in this District.

D.  **The National Beef Defendants.**

31. Defendant Marfrig Global Foods S.A. ("Marfrig") is a Brazilian corporation with its principal place of business in Sao Paulo, Brazil. Marfrig is a meat packing conglomerate that owns a controlling interest in National Beef Packing Company, LLC.

32. Defendant National Beef Packing Company, LLC ("National Beef" and, collectively with Marfrig, the "National Beef Defendants") is a Delaware limited liability company with its principal place of business in Kansas City, Missouri.

33. During at least part of the Class Period, the National Beef Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct

12

benefit from members of both Classes in the United States and in this District.

**E. The Defendants Conspired With Each Other.**

34. During the Class Period, each Defendant purchased fed cattle in the United States. In 2017, the Tyson, JBS, Cargill, and National Beef Defendants accounted for 26%, 21%, 22%, 12.5% of the total U.S. fed cattle slaughter, respectively.[1] In their 2017 fiscal years, the Tyson, JBS, Cargill, National Beef Defendants had approximately $14.8 billion, $13.4 billion, $13.1 billion, $7.3 billion, in sales in their respective beef segments.[2]

35. During the Class Period, each Defendant exploited the relationship between physical cash cattle and the CME live cattle market and transacted in cattle futures and/or options at prices they had suppressed.

36. Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

**F. Agents and Affiliates.**

37. "Defendants" refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, and directors.

---

[1] CBW Market Share.

[2] Jefferies 2018 Annual Report at 38; National Cattlemen's Beef Association "Directions statistics" (2018), at 2, http://www.beefusa.org/CMDocs/BeefUSA/Publications/CattleFaxSection.pdf; Cattle Buyers Weekly; "Top 30 Beef Packers 2018," http://www.cattlebuyersweekly.com/users/rankings/beefpackers2018.php (last accessed May 6, 2019).

38. Whenever reference is made to any act, deed, or transaction of any corporate group, corporation, or partnership, the allegation means that the corporate group, corporation, or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parents, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

## JURISDICTION, VENUE AND COMMERCE

39. This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), Sections 202 and 308 of the Packers & Stockyards Act (7 U.S.C. §§ 192, 209), and Sections 2(a), 6(c) and 22 of the Commodity Exchange Act, 7 U.S.C. §1 *et. seq*. Plaintiffs, on behalf of themselves and the Classes, seek injunctive relief, compensatory damages, treble damages, and costs, including reasonable attorneys' fees.

40. This Court has federal question subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337, 15 U.S.C. §§ 15 and 26, and 7 U.S.C. §25.

41. Venue is proper in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District;

and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Specifically:

a.   Cargill's corporate headquarters are in this District, in Wayzata, Minnesota; and

b.   Defendants purchased fed cattle owned or located in this District,[3] including from members of the Class, processed the resultant beef at plants located in this District, and/or sold resultant beef products to customers located in this District.[4]

42. Defendants' conspiracy and conduct were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States. During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal scheme.

43. This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, is located, or its co-conspirators committed overt acts in furtherance of the illegal conspiracy and manipulation of the cattle futures and options market, in the United States, including in this District. Defendants should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

---

[3] Feedlots operated in this District during the Class Period include, without limitation: Valley Oaks Steaks Co. (Johnson County); Circle A Feeders (headquartered in Miller County with operations in Cedar County).

[4] See, e.g. National Cattleman's Beef Association, Directions Statistics available at https://www.ncba.org/CMDocs/BeefUSA/Publications/CattleFaxSection.pdf (reporting that Minnesota had 2,350,000 head of cattle in 2018.

44. During the Class Period, all Defendants, foreign and domestic, engaged in conduct within the United States related to these allegations. Defendants' misconduct was purposefully directed at the United States and was specifically intended to affect the prices of fed cattle bought within the United States and live cattle futures and options. Defendants' acts in furtherance of the conspiracy provide specific personal jurisdiction over all conspirators.

45. The conspiracy and the overt acts taken in furtherance of it, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

46. Defendants' conspiracy was motivated by profits. As members of the conspiracy, foreign-based Defendants are liable for acts taken in furtherance of the conspiracy by domestic Defendants, as well as their own actions taken in the United States, and personal jurisdiction attaches, regardless of whether some portion of the conduct in furtherance of the conspiracy might have occurred overseas.

## OVERVIEW OF THE FED CATTLE MARKET

47. In 2017, roughly 25.8 million fed cattle were slaughtered and processed into beef products, accounting for 80% of the roughly 32.2 million commercial cattle slaughtered across the United States.[5]

---

[5] The remaining volume comprised slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as hamburger patties. "2017 Meat & Poultry Facts, 46th Ed.," NORTH AMERICAN MEAT INSTITUTE, 2018, at 11 ("2017 Meat & Poultry Facts").

48. The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals typically raised for meat. Fed cattle availability varies seasonally, with supplies being more plentiful over the summer months because most calves are born in the spring.

49. Fed cattle progress through three interrelated sectors before slaughter: cow/calf; stocking and background.

50. Once cattle reach between around 950 and 1,500 pounds they are marketed, transported to, and slaughtered at a packing plant operated by a beef packer such as Defendants. Defendants process the carcasses into various primal cuts that are then vacuum-packed and boxed for sale to customers of "boxed beef" who process it into cuts that are ultimately sold to consumers at retail, restaurants, and other foodservice operations. Customers of boxed beef include foodservice companies such as Sysco and U.S. Foods and large retailers such as Costco and Sam's Club.

51. Boxed beef is a commodity product, and competition to sell boxed beef is primarily on price as between boxes of equivalent USDA quality and yield grades. Defendants also process boxed beef in-house and sell case-ready beef and other value-added products (e.g., sausages) directly to retailers, restaurants, hospitals, and others at a premium over boxed beef prices.

52. As a perishable product, most beef sold domestically is sold on short-term contracts. Some large purchasers purchase some of their beef on "forward" contracts (where beef is sold before delivery) and other long-term supply agreements.

53. Historically, beef-packing was a high volume, low margin business.[6]

54. Each Defendant operates a live cattle procurement team, run by a head buyer, who is supported by "field buyers" who are responsible for territories. Field buyers buy cattle from feedlots situated inside their territory. They conduct negotiations directly with the fed cattle producers and their agents within the parameters set by their head buyer.[7]

55. Each Defendant seeks to procure enough fed cattle to operate its slaughter plants at its chosen utilization rates without interruption. Weekly plant capacity is determined both by plant size and the number and length of shifts run in a given week. Defendants' average cost of production increases if they underutilize their plant capacity.

56. Before the packing industry became consolidated, almost all fed cattle were sold through the "cash" or "negotiated" cattle trade. Meat packers' buyers went to feedlots and auctions and paid a cattle price set each day at the dollar mark where supply and demand met.

---

[6] See Amended Complaint, ¶ 24, U.S. v. JBS SA (N.D. Ill., Eastern Division) (08-cv-05992), filed on November 7, 2008 ("U.S. v. JBS Amended Complaint").

[7] Producers commonly delegate marketing authority to the commercial feedlot or to third-party marketing cooperatives. A small portion of the fed cattle sales to Defendants also occur at public auctions.

57. By 2015, the cash cattle trade drastically thinned, now accounting for a minority of national fed cattle sales. Nevertheless, the cash cattle trade remains the industry's price discovery mechanism and continues to determine the price of fed cattle bought using "formula" or "forward" contracts – which now constitute the majority of fed cattle sales. Under these "captive supply" agreements, producers commit to deliver their cattle to a packer once they reach slaughter-weight at a price to be determined at or around the point of delivery pursuant to an agreed formula.

58. The price of cattle delivered under formula contracts is determined by reference to a stipulated measure of cash cattle prices at, or just prior to, the delivery date. These contracts commonly incorporate a specified average cash price reported by the USDA Agricultural Marketing Service's ("AMS") Livestock Mandatory Reporting's ("LMR") cattle transaction price summaries.[8] Moreover, the price of cattle delivered under forward contracts is typically established by reference to the price of the live cattle futures contract settling in the month of or adjacent to the expected delivery date. The price of live cattle futures contracts is directly impacted by current and expected cash cattle prices. The price of cash cattle thus sets or drives the price of the bulk of Defendants' fed cattle purchases, despite constituting only a small percentage of total fed cattle purchases.[9]

---

[8] These price series collate the information Defendants and others are required to submit to the USDA on a daily and weekly basis regarding their live cattle purchases and deliveries under the Livestock Mandatory Reporting Act of 1999. The Act imposes similar reporting obligations on packers for their boxed beef sales.

[9] The base prices used in negotiated grid contracts are also impacted by changes in cash cattle prices.

59. Each Defendant uses captive supply agreements for the bulk of its procurement needs. Captive supply agreements have incentivized and enabled Defendants' suppression of cash cattle prices. The greater a Defendant's supply of captive cattle, the less reliant it becomes on participating in the cash cattle trade to procure enough cattle to operate its slaughter plants at its desired throughput. This, in turn, allows a Defendant to abstain from purchasing cash cattle when it regards market prices to be too high. All things being equal, a reduction in demand for cash cattle causes cash cattle prices to drop, as producers are forced to lower their asking price to attract a buyer willing to purchase and slaughter the producer's perishable product. And because cash cattle prices are used to set the prices paid under formula contracts and directly impact the live cattle futures prices incorporated into forward agreements, a reduction in cash cattle prices reduces the price paid by Defendants for cattle bought on such contracts.

60. Because the cost of fed cattle is the largest cost of production, Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef.[10] The meat margin is very sensitive to changes in industry aggregate slaughter levels, and Defendants can, by conspiring, increase it. As noted by the U.S. Department of Justice ("DOJ"), "all else being

---

[10]   Jefferies   Financial   Group   Inc.,   Annual   Report,   (Form   10-K)   (Jan.   10,   2019) https://www.sec.gov/Archives/edgar/data/96223/000009622319000009/jfg2018113010kcombodoc.htm ("Jefferies 2018 Annual Report"), at 38 ("National Beef's profitability is dependent, in large part, on the spread between its costs for live cattle, the primary raw material for its business, and the value received from selling boxed beef and other products, coupled with its overall volume.").

equal, when the meat Packer industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits."[11] Defendants can thus increase their profitability by coordinating their respective slaughter levels at or below the prevailing supply of slaughter-weight fed cattle.

61. As noted by the DOJ: "The major packers obtain significant information about each other's past and future output decisions, including the number of days and shifts that competitors' plants operate. Information about production levels is obtained by directly observing plant operation and from third party sources, including USDA reports showing aggregate industry slaughter of fed cattle. Major packers use this information to calculate market shares based on output and consider this information when setting their own production schedules."[12]

62. The fed cattle market is highly concentrated. In fact, during the Class Period, Defendants have collectively purchased and slaughtered between 81 to 85% of the 23 to 27 million fed cattle slaughtered in the United States annually.[13]

---

[11] *U.S. v. JBS* Amended Complaint, ¶¶ 26-27.

[12] *Id.* at ¶ 27.

[13] 2017 Meat & Poultry Facts at 11; CBW Market Share.

63. During this same period, Defendants' respective shares of annual fed cattle slaughter have remained stable despite yearly variation in slaughter numbers. The remainder of the U.S.'s fed cattle slaughter capacity is predominantly provided by regional independent packer businesses such as Greater Omaha and Nebraska Beef, which typically only operate one plant (the "Regional Packers").[14]

### DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE PRICES

64. Fed cattle prices increased consistently from 2009 through 2014, peaking in November 2014 at approximately $170 per hundredweight ("CWT").[15] Market analysts, such as the USDA Economic Research Service, predicted that the price levels established in 2014 would continue for a number of years before experiencing a gradual decline.[16] Some forecasters even foresaw no drastic change from 2014 prices "barring any outside market shocks like drought or a U.S. economic recession."[17]

---

[14] Lee Schulz, *et al.*, "Economic Importance of Iowa's Beef Industry," IOWA STATE UNIVERSITY (Dec. 2017), https://store.extension.iastate.edu/product/Economic-Importance-of-Iowas-Beef-Industry; and CBW Market Share.

[15] Cattle are typically priced on a live-weight basis (the price per CWT applied to the live-weight of the animal prior to slaughter) or a carcass-weight or "dressed" basis (the price per CWT applied to the animal once "dressed," i.e., slaughtered with its head, hide, and internal organs removed). References to fed cattle prices herein are on a live-weight basis unless otherwise stated. Live-weight and carcass-weight prices typically move together, as both are based on the expected value of the cattle once slaughtered.

[16] U.S. Dep't of Agric., OCE-2015-1, Off. of the Chief Economist: USDA Agricultural Projections to 2024, Interagency Agricultural Projections Committee (February 2015) at 81, https://www.usda.gov/oce/commodity/projections/USDA_Agricultural_Projections_to_2024.pdf.

[17] "Livestock Monitor, A Newsletter for Extension Staff, "LIVESTOCK MARKETING INFORMATION CENTER, STATE EXTENSION SERVICES IN COOPERATION WITH USDA (Jan. 12, 2015), at 2; and "Cattle Fax Predicts Strong Prices to Remain in 2015," AGWEB (Feb. 6, 2015), https://www.agweb.com/article/cattlefax-predicts-strong-prices-to-remain-in-2015-naa-news-release/

65. While Defendants initially benefited from the rise in fed cattle prices because wholesale beef prices rose in parallel, the meat margin fell to a low of approximately $50 in the months leading up to 2015, sending the packers' margins into the red.

66. In response, Defendants commenced and/or accelerated their conspiracy to depress and stabilize the price of fed cattle purchased in the United States. At the heart of their conspiracy was an agreement to reduce and then manage their respective slaughter volumes: a classic abuse of monopsony power and a classic feature of buying cartels. Defendants implemented their buying cartel, by, among other conduct, agreeing to: (1) periodically restrain or reduce slaughter numbers so as to reduce demand for fed cattle; (2) curtail their purchases of cash cattle during these periods; (3) coordinate their procurement practices with respect to the cash cattle they did in fact purchase; (4) import foreign cattle to depress demand for cheaper domestic cattle; and (5) close or idle slaughter plant and refrain from expanding their remaining slaughtering capacity.

## I.  Defendants Agreed to Coordinated Slaughter Reductions.

67. Defendants agreed to periodically reduce slaughter volumes in response to actual or anticipated rises in fed cattle prices during the Class Period.

68. On multiple occasions, beginning in or around 2015, Defendants agreed to collectively reduce their slaughter volumes in response to rising fed cattle prices.

---

("Analyst[s] . . . expect fed cattle prices averaging in the mid-$150s [per CWT in 2015], slightly higher than last year. Prices will trade in a range from the near $140 [per CWT] in the lows to near $170 [per CWT] in the highs in the year ahead.").

69. The purpose of the agreed slaughter reductions was to force cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would force producers to either accept lower cash prices for their cattle or commit their cattle in advance on captive supply agreements. Put another way, by creating and encouraging fear for producers that they might not be able to "get their cattle dead," Defendants aimed to increase their collective leverage over producers because once cattle are fed beyond their ideal slaughter-weight, producers face increasing pressure to drop their prices to get rid of their highly perishable cattle.

70. On information and belief, the slaughter reduction varied from plant to plant, depending on, among other things, their slaughter capacity and the supply of fed cattle in the surrounding region. Slaughter plants appear to have implemented Defendants' agreement through planned and unplanned maintenance shutdowns, as well as deliberately reducing slaughter output below slaughter capacity.

71. On information and belief, Defendants' agreement extended to proportionate slaughter reductions designed to suppress seasonal rises in fed cattle prices, such as those traditionally experienced in the late winter/early spring, and in the fall.[18]

---

[18] See, e.g., Cassandra Fish, "And the Beat Goes On," THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/. ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount. Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day. Others will pull back hours to 36-hour work week.").

**II.  Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions.**

72. To further depress cattle prices, Defendants–on information and belief–agreed to drastically reduce their purchase of cash cattle during periods of agreed slaughter reduction or restraint. When doing so, Defendants could still obtain the cattle needed to satisfy their curtailed kill numbers by leaning on their own cattle and cattle deliverable under previously-agreed formula and forward contracts.[19] And, because Defendants had successfully thinned the cash cattle trade in the decade preceding 2015, even small reductions in their cash cattle purchases had an outsized impact on cash cattle demand.

73. By reducing their purchases of cash cattle, Defendants sought to reduce the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts. By reducing their cash cattle purchases for a period of weeks or months, Defendants could back-up the volume of slaughter-ready cash cattle, thereby coercing producers to overfeed their cattle and/or accept lower prices or enter captive supply agreements to timely market their perishable product.[20]

---

[19] *See* Cassandra Fish, "Futures Treading Water; Packers Keep Pressure On" The Beef (June 17, 2015), https://www.thebeefread.com/2015/06/17/futures-treading-water-packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small. The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

[20] Cassandra Fish, "Whatever Happened to a Fair Fight," The Beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/ ("The conversation is no longer, what's cash going to be, but rather, who needs any.... The smaller feeder is left to fight it out. Hoping he can get a buyer to come by and look at his cattle. Pressured to sell cattle with time. Anything to get cattle gone. Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer. Powerlessness is widely felt by smaller producers on a regular basis.").

74. Producers have limited if any meaningful leverage to bid up Defendants in such circumstances, because if producers don't accept basis bids[21] and thereby add to the packers' captive supply, they bear the risk that the cash price will drop.

75. In turn, producers' incentive to avoid the risk of a price drop creates downward pressure on the cash price, which in turn creates downward pressure on the formula and forward contracts.

76. The lower reported cash prices were then incorporated into Defendants' formula and forward contacts – the latter via a depression of live cattle future prices – thereby lowering the costs of all the cattle delivered to Defendants' plants.[22] And once a condition of actual or perceived oversupply had been created, Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices.

77. Defendants' implementation of their conspiracy precipitated the dramatic collapse in fed cattle prices in 2015.

---

[21] The "basis bid" is a form of most favored nation contract under which the packer agrees to pay the producer some variant of that week's top reported cash price, with or without a premium. Defendants used such bids during the Class Period to further reduce the number of cattle they needed to purchase during the weekly cash cattle trade, thereby putting further pressure on cash cattle prices.

[22] Cassandra Fish, "Cash Trade Volume Tiny; Futures Shake it Off," The Beef (June 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet. But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.").

## III. Defendants Coordinated Their Procurement Practices for Cash Cattle.

78. A third prong of Defendants' conspiracy involved coordinating how each Defendant purchased cash cattle.

79. First, Defendants supported their conspiracy by collectively enforcing a queuing convention via threats of boycott. That convention works as follows: once a bid is received from Packer A, the producer may either accept the bid or pass. But the producer may not "shop" that bid to other packers. If the producer passes on the bid to seek further bids from other packers, the producer must inform them that he was bid "X" by Packer A and that he can, therefore, only accept bids of X+$1.[23] If Packer B is only willing to bid X or if the producer wants to alter its reservation price, the producer is obligated to first return to Packer A, who is "on the cattle" at price X and offer it a right-of-first-refusal. Only if Packer A declines can the producer offer to sell to Packer B at X or the new reservation price. At this point, however, Packer B is under no obligation to purchase from the producer.

80. On information and belief, Defendants enforced strict adherence to this convention with threats of retaliation. Packer Defendant who were "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted out of turn.

---

[23] In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

81. Second, on information and belief, a Defendant would, for periods of time, sometimes extending across many months, offer the only bid (or the only credible bid) for a particular feedlot's fed cattle (or substantially all its fed cattle) week to week, ensuring that the feedlots affected could not regularly procure credible bids from the other Defendants. Buyers for these other Defendants would even routinely fail to take or return calls from the producer until after the Friday trading window had closed. These arrangements – akin to a "home-market" market allocation scheme – indicate an agreement among Defendants to respect each other's relationships with each Defendant's preferred suppliers.

82. Third, Defendants periodically stopped buying cash cattle from feedlots located in a region for weeks to back-up cash cattle in those regions and break the resolve of producers to hold-out for higher prices. Having boycotted a region for weeks, Defendants would then begin purchasing cattle from that region again during the same week. When executing this scheme, Defendants would often seek to initiate their weekly cash cattle trade in the region recently boycotted. This allowed them to use the lower prices agreed to in that region to set the "market" for the remainder of the trade. In doing so, Defendants were able to influence the prices of fed cattle sales across the United States.[24]

---

[24] For similar reasons, Defendants would also, at times, seek to set the market price lower by opening the weekly trade by purchasing a pen of poor quality cattle at a discount.

83. Fourth, Defendants suspiciously all chose to reserve most of their weekly cash trade procurement activity for Friday, typically after the CME had closed. This practice deprives producers of a price discovery mechanism and limits the ability of producers who hedge their cattle on the CME to manage their positions in response to the bids offered by the packers. While the exact time on Friday varied from week to week, Defendants would consistently conduct all, or substantially all, of their weekly cash cattle trade during the same 30- to 60-minute window on a Friday. During that window, Defendants typically adhered to the price level established by the Defendant that opened the weekly cash cattle trade, which would quickly be circulated across the market via word-of-mouth and industry reporting. If a Defendant felt it necessary to offer prices above this price level to secure the cattle it required, it would often hold such bids back until after the core trading window had closed. This reduced the chance that reports of such bids might impact negotiations conducted during the core trading window.

84. In contrast, Regional Packers continued to purchase cash cattle nearly every day of the week, thereby securing pens of high-quality cattle with limited competition. When operated alongside Defendants' slaughter restraint and other bidding practices (outlined above), this practice reduced competition amongst Defendants for cash cattle to a race to place the first bid on each pen during the Friday cash trade. This deprived producers of a price discovery mechanism and limited the ability of producers who hedge their cattle on the CME to manage their positions in response to the bids offered by the packers.

85. For similar reasons, Defendants also, at times, sought to lower the market price by opening the weekly trade by purchasing a pen of poor-quality cattle at a discount.

86. Reported cash cattle trade across AMS LMR's price reporting regions confirms both that Defendants reduced their participation in the cash cattle trade and that they conducted the bulk of their cash trading on Fridays.

87. The reported data are consistent with an agreement among Defendants to both: (1) limit their purchases of cash cattle; and (2) conduct all, or substantially all, of their cash cattle trade in a short window of time. If any single Defendant took these actions in the absence of such an agreement, that Defendant would risk failing to secure a sufficient quantity or quality of cattle to operate its plants at the most efficient capacity and/or meet customer demand, without any guarantee that its actions would have the desired impact on fed cattle or beef prices. The data are even more striking when one considers that Regional Packers continued to purchase cash cattle throughout the week and thus can be regarded as being responsible for the bulk of the transactions reported mid-week.

88. Defendants' increased reliance on formula and forward contracts and the corresponding decrease in the number of cash cattle transactions does not explain the pattern reflected in the data. While the number of cash cattle bought annually fell continuously from 2005 to 2015, it was not until 2014/2015 that the data show a dramatic increase in the number of days without any reported cash transaction. This rise is then sustained despite a slight increase in cash cattle buying year-on-year in 2016 and 2017.

89. In short, even though cash cattle slaughter numbers increased slightly after 2015, the number of days per month in which there were no cash cattle transactions also increased. Consequently, Defendants' coordinated reduction in the number of days on which they purchase cash cattle is not explained merely by the decline in the number of cash cattle purchased annually.

## IV.  Defendants Uneconomically Imported Foreign Live Cattle to Depress Demand for U.S. Fed Cattle.

90. Defendants also engaged in coordinated imports and shipping practices that reduced demand for domestic fed cattle and suppressed the cash price transaction reports used to set the price of cattle procured under captive supply agreements. In particular, Defendants shipped cattle over uneconomically long distances to their slaughter plants, from locations both inside the United States and from Canada and Mexico, to avoid bidding up the reported price of cattle in closer AMS LMR reporting regions.

91. Given the additional freight costs incurred in procuring fed cattle from Canada or Mexico, it is only economical for a Defendant to incur the additional costs when the prevailing price differences against domestic prices exceeded the additional costs. But the data indicate that Defendants' imports of live cattle from Canada and Mexico began to increase slightly in 2014, and continued, even after it became uneconomical for them to do so in or around mid-2015:[25]

---

[25] On information and belief, Defendants are responsible for the bulk of all live cattle imports for slaughter.

92. Live cattle imports gradually declined until 2014 when they stabilized and began a slight upward trend. While such imports were originally economical, considering the prevailing price differences (adjusted for shipping costs and exchange rates), from mid-2015 onwards, they were often uneconomical, and became increasingly so as the Class Period continued. This is particularly the case in relation to Canadian cattle, which comprised the majority of all live cattle imports for slaughter.

93. On information and belief, procuring Canadian and Mexican fed cattle from mid-2015 onwards was regularly more expensive than procuring fed cattle from the adjacent U.S. feeding regions.

94. Such concerted actions are consistent with a conspiracy to depress U.S. fed cattle cash prices. A Defendant would not incur the additional cost associated with the import and purchase of foreign or extra-regional cattle in the hope of lowering its captive supply procurement costs unless it knew that its major competitors would do the same thing, and therefore, also abstaining from bidding up local cash cattle prices.

## V.  Defendants Agreed Not to Expand Their Slaughtering Capacity.

95. To further their conspiracy to manipulate the fed cattle market, Defendants also agreed not to expand their respective slaughtering capacity, or to increase their use of existing capacity. Defendants' plant closures stripped out millions of head of cattle from the industry's annual slaughter capacity, thereby limiting demand for fed cattle. In relation to each closure, the relevant Defendant offered pretextual explanations such as a

lack of available cattle in the adjacent regions and plant inefficiencies. National Beef even rejected a significant package of incentives offered by local government, utilities and nearby feedlots when it decided to close its Brawley plant [26]

96. As a result, the United States has experienced both a decline in fed cattle slaughter capacity and an underutilization of that lowered capacity. This decline in marketing outlets for fed cattle producers has been compounded in certain regions, where cattle producers now only have one, or possibly two, slaughter plants to which they are able to sell their cattle.

**DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE COLLAPSE
AND SUPPRESSED PRICES THEREAFTER**

## I.  Defendants' Conduct Precipitated the Collapse in Fed Cattle Prices in 2015.

97. Defendants' conspiracy succeeded. Responding to the compression of their margins in late 2014, Defendants reduced their slaughter volumes, and this reduction had the desired effect. For the first half of 2015, prices fluctuated at or around $160 CWT, $10 CWT (or about $130 per head) lower than the high established in November 2014.

98. Not satisfied, Defendants embarked on an unprecedented slaughter reduction during the second and third quarters of 2015. To place further pressure on cattle prices, Defendants also drastically reduced their purchase of cash cattle, leaning heavily on their

---

[26]. "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMAN (March 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

own cattle and other captive supplies to satisfy their curtailed kill numbers.[27] Defendants' strategy was immediately successful, with cash cattle – and thus formula cattle – prices falling continuously across June to about $150 CWT.[28] Meanwhile, with lower slaughter volumes and lower boxed beef output, the meat margin expanded rapidly, bloating Defendants' margins.

99. Tight fed cattle supplies do not explain Defendants' reduced slaughter volume. The available supply of fed cattle increased on a year-on-year basis, reflecting the continuing rebuild of the cattle herd. Fed cattle inventory was higher in almost every month of 2015, compared to 2014.

100.   Industry analysts noted Defendants' determination to "break" cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases.

---

[27] Defendants' slaughter levels of their own cattle across the second half of 2015 were steady on a year-on-year basis, as reported by AMS LMR Report "LM_CT153 – National Weekly Direct Slaughter Cattle – Prior Week Slaughter and Contract Purchases," https://marketnews.usda.gov/mnp/ls-report-config; *see also* Cassandra Fish, "Cash Trade Volume Tiny; Futures Shake it Off" The Beef (June 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet. But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive. Only problem is, packers weren't able to secure enough cattle cheaper, even when relying on captives, to easily fill an even curtailed kill expected this week at 540,000 head. June forward contracts are rumored being called in as a way to offset the absence of negotiated purchases."); and Fish, "Futures Treading Water; Packers Keep Pressure On" ("The news is well known this week and the packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small. The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

[28]   Cassandra   Fish,   "Smack   Down,"   The   Beef   (June   15,   2015), https://www.thebeefread.com/2015/06/15/smack-down/ ("Cash cattle prices broke hard Friday as packers successfully executed a strategy of slashed kills and limited negotiated purchases.").

On June 12, 2015, analyst Cassandra Fish of "The Beef," and formerly a risk manager at Tyson, pondered when a Defendant might break ranks:

> Rarely has this industry segment [the beef packers,] been an all-for-one and one-for-all group. All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?[29]

101.    Ms. Fish answered her own question in the negative a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed in a timely fashion."[30]

102.    Defendants tightened the screws during the remainder of 2015. They continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up" and were reaching historically heavy weights.[31]

103.    This was particularly evident in September 2015, when Defendants utilized the leverage they had gained over producers in the prior months to great effect, pushing

---

[29] Cassandra Fish, "Futures Holding Gains; Waiting on Cash," The Beef (June 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

[30] Cassandra Fish, "Another Round of the Blues," The Beef (June 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.

[31] Cassandra Fish, "Kills Too Small For Too Long," The Beef (Sept. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

prices down to $120 CWT by months' end, despite increasing their purchases of cash cattle. Defendants also demanded extended delivery periods of two to four weeks as a condition of trade throughout the month, providing them with further leverage over producers who still had cattle to sell.[32] As a result, large numbers of the cash cattle sold in September were not slaughtered until October.

104.   As Ms. Fish lamented on November 10, 2015, the "[p]ackers no longer compete against each other to buy fed cattle each week," and were consequently reaping "gangbuster profits."[33]

105.   During the second half of 2015, after Defendants embarked on their collusive reduction in slaughter volume, producer margins were materially reduced, while Defendants' margins remained positive.

## II. Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices.

106.   Following their successful 2015, Defendants continued to limit their collective slaughter numbers and cash cattle purchases in 2016. While monthly slaughter volumes for the first three quarters of 2016 were up after 2015's record lows, they remained flat or below 2014 levels despite the available supply of fed cattle having risen again.

---

[32]   Cassandra   Fish,   "No   bottom   in   sight,"   The   Beef   (Sept.   16,   2015), https://www.thebeefread.com/2015/09/16/no-bottom-in-sight/.

[33]   Cassandra   Fish,   "Whatever   Happened   to   a   Fair   Fight"   The   Beef   (Nov.   10,   2015) https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.

107.    As a result, the price of fed cattle continued to fall across 2016 to a low of roughly just below $100 per cwt in mid-October. As in 2015, Defendants responded by dramatically increasing kill volumes in the fourth quarter of 2016.

108.    Defendants' success in "backing-up" cash cattle in the summer of 2016 is confirmed by the fact that Defendants were able to raise cash cattle slaughter levels in the fourth quarter of 2016 over 2014 and 2015 levels without causing a dramatic rise in prices.[34] The gradual price increase was consistent with the seasonal rise in fed cattle prices typically experienced in the fourth quarter of each year as the availability of slaughter-weight cattle declines. But for the glut in slaughter-ready cattle created by Defendants' coordinated actions, prices would have risen significantly in response to the Defendants' dramatic increase in year-on-year slaughter numbers.

109.    In 2017 and 2018, having already reduced their slaughter volumes below historic levels and curtailed their cash cattle purchases, Defendants told the market they had insufficient capacity to slaughter the supposed "wall of cattle" due to reach

---

[34] *See* Cassandra Fish, "And it All Falls Down," The Beef (Sept. 27, 2016), https://www.thebeefread.com/2016/09/27/and-it-all-falls-down/ ("The big carryover of unsold negotiated cattle from last week has gained negative status as the hours have rolled by, with packers willing and able to sit back and lower bids to $104, $6 lower than 2 weeks ago and $3 lower than the few that traded Friday and Saturday"); and Cassandra Fish, "Despondency," The Beef (Oct. 11, 2018), https://www.thebeefread.com/2016/10/11/despondency/ ("As if on cue, kills this week are now rumored to be cutback to 585k-595k, with a cooler cleaning and Saturday kills out. . . . A pull back in the kill with record packer margins cements the reality that easily and efficiently killing our way through the numbers, which used to be a reality, isn't any longer. This makes it difficult for the market to return to fully current marketing status if there is any slowdown in kill.").

slaughter-weight in the summer of 2018.[35] Defendants thus encouraged producers to prematurely sign captive supply agreements to ensure they could "get their cattle dead" before Defendants ran out of "hook" or "shackle space."[36] At the same time, Defendants managed their respective slaughter volumes to ensure that their collective demand did not exceed the available supply.[37]

110.    Defendants' tactics succeeded. Prices fell in late Winter/Spring 2018 despite record strong beef demand and tight supplies of slaughter-ready cattle across March and April. Indeed, prices fell from around $129 per CWT at the beginning of March 2018 to $110 per CWT by the beginning of May 2018. Prices remained low until mid-November 2018, a significant extension of the one to two-month summer low typically experienced by the market. And of course, Defendants never reached slaughter capacity.[38]

---

[35] Cassandra Fish, "Still Green!?!" The Beef (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018]. The limitation perception is linked to labor. The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [i.e., on captive supply agreements].").

[36] *See* Cassandra Fish, "Holding Gain," The Beef (Apr. 18, 2018), https://www.thebeefread.com/2018/04/18/holding-gains/ ("Cattle feeders, still fearful of growing supplies in May, June and beyond continue to sell cattle for May at substantially lower prices than current values.").

[37] Cassandra Fish, "Futures Trade Both Sides; Cash Poised To Trade Lower," The Beef (Apr. 2, 2018), available at: https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/ ("Looking back at March's fed slaughter rate, it underperformed expectations.... Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable.").

[38] Cassandra Fish, "Quiet Conclusion," The Beef (June 1, 2018), https://www.thebeefread.com/2018/06/01/quiet-conclusion/ ("As each week goes by in June, the calendar will take the industry into the heart of one of the most well-advertised "walls" of market-ready cattle in memory. Now that it is a known fact that the industry can kill 540k head of fed cattle and that demand can absorb the largest beef production in 10-years, the panic experienced in March seems overdone.").

III.     **Defendants Publicly Signaled Their Commitment to Supply Restraint.**

111.     Defendants' joint efforts to periodically curtail slaughter levels to "balance" their demand to supply are further evidenced by public statements by senior executives about their firms' commitment to production restraint and operating a "margin" rather than a "market share" business. Explicit and implicit in the executives' statements was the importance of restricting slaughter levels and capacity across the industry.

112.     For example, commenting on National Beef's decision to close its Brawley, California plant on January 31, 2014, Tyson's COO stated "it is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production ... to some extent, we've always felt that - and anticipated something like that would happen."[39]

113.     As prices continued to rise in 2014, JBS director Wesley Mendonca Batista responded to an analyst's question as to whether U.S. fed cattle slaughtering capacity needed to be rationalized by suggesting that JBS's recent acquisition of XL Foods' Omaha, Nebraska plant was probably a mistake, and that slaughtering capacity needed to come out of California and at least one other U.S. region ("If you want to be balanced you need to have capacity to be shut there.").[40]

---

[39] Tyson Foods Q1 2014 Results Earnings Call Transcript (Jan. 31, 2014), at 4.

[40] JBS Q3 2014 Earnings Calls Transcript (Nov. 13, 2014), at 12.

114.    Even after fed cattle prices had already collapsed, Tyson's then-CEO Donald Smith still publicly stressed the need for further slaughter reductions in August 2015: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate, and conditions are expected to improve for the long term."[41]

115.    JBS's André Nogueira de Souza went further and publicly praised Defendants' efforts to reduce industry-wide slaughter capacity through plant closures, noting that it had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[42]

116.    Defendants' executives knew they needed to tread carefully in their public exhortations for slaughter restraint, as shown by Tyson's then-CEO Donnie Smith's slip during his discussion of output restraint during Tyson's Q4 2015 Earnings Call:[43]

> You've got relatively low cattle supply, you've got too much -- well, not to say too much, probably not the right way to say it, but you've got excess industry capacity. And that limits our ability to drive margins above the 1.5% to 3%, we think.

117.    Such comments are typical in cartels because the comments serve to publicly affirm – in euphemistic terms – the conspirators' private understandings.

---

[41] Tyson Foods Q3 2015 Results Earnings Call Transcript (Aug. 3, 2015), at 4.

[42] JBS Q3 2015 Results Earnings Call Transcript (Nov. 12, 2015), at 9.

[43] Tyson Foods Q4 2015 Earnings Call Transcript (Nov. 24, 2015).

IV.     **Economic Analysis Supports the Existence of the Alleged Conspiracy to Depress Fed Cattle Prices.**

118.    Economic data and analysis corroborate the direct and circumstantial evidence of the alleged conspiracy. In particular, data and analysis confirm that: (a) the collapse in fed cattle prices in 2015 cannot be explained by common supply or demand drivers; (b) from at least January 1, 2015, fed cattle prices were artificially depressed; and (c) other explanations potentially offered for the 2015 price collapse do not withstand scrutiny.

A. **Supply and Demand Drivers Do Not Explain the 2015 Price Collapse or Subsequent Low Prices**

119.    The prices for fed cattle bought across the United States followed a discernible pattern: increasing consistently from 2009 through 2014 (accounting for seasonal fluctuations in prices), collapsing dramatically in 2015, and then stabilizing below the prior trend line.

120.    Seasonal changes do not explain the dramatic depression of fed cattle prices during the Class Period. Historically fed cattle prices tend to gradually rise during the first quarter until the early part of the second quarter, peaking in March or April. Prices then tend to trend downwards to a summer low typically established in June or July, before commencing an upward trend that typically peaks in November. [44]

---

[44] "Annual and Seasonal Price Patterns for Cattle," CORNHUSKER ECONOMICS, University of Nebraska-Lincoln (Aug. 19, 2015), https://agecon.unl.edu/cornhusker-economics/2015/annual-and-seasonal-price-patterns-for-cattle.

121.    Fed cattle producers' main cost – purchasing feeder cattle – also increased and decreased during this period. But the decline in feeder cattle costs did not occur until after fed cattle prices collapsed in 2015.[45]

122.    That a decline in the fed cattle producers' costs did not cause the 2015 decline is evident when one compares fed cattle prices to fed cattle producers' total costs.

123.    In fact, during 2015, when fed cattle prices underwent a drastic decline, the costs borne by fed cattle producers increased. Specifically, from January 2015 to January 2016, fed cattle prices in Iowa and Minnesota, for example, decreased by approximately 20.7%, whereas input costs increased by approximately 2.6%.[46]

124.    Because of this dramatic disconnect between fed cattle prices and input costs, fed cattle producers suffered their largest losses in 30 years during 2015 and 2016.

125.    While fed cattle producers enjoyed a profitable 2017, this was largely due to a significant drop in the input costs associated with fed cattle marketed during that year, and in particular, the price of feeder cattle. Defendants were able to constrain the typical seasonal rise in fed cattle prices across the first half of 2017 and continued to profit from historic margins.

---

[45] *See* Iowa State University's estimate of the break-even price (i.e., the cost) associated with feeding a 750-pound yearling to a market weight of 1,250 pounds. Ag Econ Department, Cooperative Extension Service, Iowa State University, "Estimated Livestock Returns" available at: http://www2.econ.iastate.edu/estimated-returns/.

[46] *See id.*

126.    Nor do changes in beef demand or consumer preferences explain the depression of fed cattle prices. While there was a 5.67% decline in retail beef prices from January 2015 to January 2016, prices rebounded in the months that followed, before going down, then up again thereafter. Importantly, the spread between retail beef prices and fed cattle prices continued its gradual increase, consistent with its upward trend during the past 20 years, suggesting beef demand remained robust. [47]

**Monthly Beef Demand Indices, Jan. 1988 – Oct. 2017[48]**



127.    What changed in 2015 was the meat margin. The meat margins realized by Defendants in the aftermath of the 2015 price collapse – which at times exceeded $600 per head – were historically unprecedented.

---

[47] USDA, Economic Research Service ("ERS"), "Meat Price Spreads," (last accessed May 3, 2019), https://www.ers.usda.gov/data-products/meat-price-spreads/.

[48] "Assessing Beef Demand Determinants" (Jan. 18, 2018), pp. 13-14, available at: https://www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_FullRe port.pdf.

**B.   Other Explanations for the Drop in Fed Cattle Prices Do Not Withstand Scrutiny**

128.    The United States Government Accountability Office's ("GAO") 2018 Report suggests potential explanations for the price collapse proffered by Defendants and others. These explanations, however, are not borne out by the facts.

129.    For example, the GAO Report mentions that the droughts of 2011-2013 might have reduced the availability of forage to raise calves and feeder cattle, leading ranchers to reduce cattle inventory.[49] Under this explanation, ranchers expanded their inventory once the drought eased, thereby oversupplying the market and causing prices to crash. Any oversupply of feeder cattle, though, should have caused a collapse in the price of feeder cattle, which did not happen until well after fed cattle prices had collapsed

130.    It has also been suggested that the increase supply of corn seen in the aftermath of the 2011-2013 droughts encouraged fed cattle producers to feed their cattle for longer than they typically would. The resulting fatter cattle then received lower prices per CWT, as is customary. This premise is faulty: Most producers did not choose to overfeed their cattle but were forced to do so by Defendants' coordinated slaughter restrictions.

131.    Finally, the strengthening of the U.S. dollar in 2014 and potentially related changes in the volume of U.S. imports and exports of live cattle and beef also cannot explain the price collapse.[50] These events were not even in lock-step with the collapse in

---

[49] 2018 GAO Report at 12.

[50] *Id.* at 14.

fed cattle prices in the second half of 2015. In fact, during the second half of 2014, when net imports of beef and the U.S. dollar were increasing, fed cattle prices still increased to their November 2014 peak. In the first half of 2015, net imports were transiently around 8% of total U.S. production, but by November 2015 – when fed cattle prices had bottomed out – net imports of beef had turned slightly negative.

## THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION

132.    The structure and characteristics of the market for the purchase of fed cattle make the market highly susceptible to collusion. These facts, when considered against the backdrop of Defendants' actions that are consistent with collusion and inconsistent with the proper functioning of a competitive market, support an inference of the anticompetitive agreement alleged herein.

## I.   The Fed Cattle Packer Industry Is Highly Consolidated and Highly Concentrated.

133.    The Fed Cattle Packer industry is highly concentrated.[51] Since JBS's acquisition of Smithfield Beef Group, Inc. in 2008, Defendants' cumulative share of annual purchases of U.S. fed cattle has approximated 81-89% each year, with each Defendant's individual

---

[51] The U.S. national four-firm concentration ratio (CR4) for beef packers rose from 25% in 1977 to 71% in 1992, the first year in which the national Herfindahl-Hirschmann Index ("HHI") exceeded 1800. Since that time, the HHI index for the industry has only increased, particularly in certain regions. U.S. v. JBS Amended Complaint, ¶ 36-37; Cai, Stiegert, and Koontz, Regime Switching and Oligopsony power: the case of US beef processing, Food System Research Group, Working Paper Series, (2010 Cai, X., K. W. Stiegert, and S. R. Koontz. "Oligopsony Fed Cattle Pricing: Did Mandatory Price Reporting Increase Meatpacker Market Power?" Proceedings of the NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. Available at http://www.farmdoc.illinois.edu/nccc134/conf_2011/pdf/confp24-11.pdf.

share of annual purchases remaining largely static. No Regional Packer possesses a double-digit market share, with Greater Omaha, Defendants' nearest rival, maintaining a 2.5-3.5% market share through its Omaha, Nebraska plant. Unsurprisingly, the GAO's 2018 Report found that lower "packer competition in any given area was associated with lower fed cattle prices in that area."[52]

## II. The Supply of Fed Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price.

134.    Recent studies have shown that the quantity of beef U.S. consumers purchase has become less sensitive to changes in beef prices, and the impact of such price changes on beef demand is small relative to other factors.[53] Beef's own price elasticity for the period 2008-2017 was estimated at -0.479, indicating that a "10% price increase would reduce [beef] demand by 4.79%."[54] As a result, Defendants are incentivized to reduce fed cattle slaughter and beef production, as neither they, nor their immediate customers, are harmed by the resulting wholesale and retail price increases.

135.    Further, as noted above, reduced slaughter volumes and/or lower fed cattle prices are unlikely to significantly alter the immediately available supply of fed cattle. Because of cattle's comparably long life cycle, cattle producers typically require about 39

---

[52] 2018 GAO Report at 15-16.

[53] Glynn Tonsor, Jason Lusk, Ted Schroeder, "Assessing Beef Demand Determinants" (Jan. 18, 2018), at 7-9,          www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_FullReport.pdf.

[54] *Id.*

months to alter supply levels once a decision has been made to increase production.[55] As a result, fed cattle supplies are relatively insensitive to short-term price changes, particularly given the absence of a substitute market into which fed cattle producers can sell their cattle.

### III.   Fed Cattle Producers Face Significant Market Access Risk.

136.   As perishable commodities, producers face significant pressure to sell their cattle within weeks of reaching slaughter-weight.[56] As noted by Grain Inspection, Packers and Stockyards Administration (now a part of the AMS), "[c]attle held beyond the optimal marketing period begin to decrease in value because of excessive fat gain and the rising cost of gain."[57] Further, continuing to hold slaughter-weight cattle increases the risk of death loss, which elevates after cattle spend more than 5-6 months in the feedlot.[58]

137.   These facts, coupled with the absence of a substitute market to sell fed cattle, expose fed cattle producers to market access risk, namely "the availability of a timely and appropriate market outlet."[59]

---

[55]   Tyson Foods Inc. "Investor Fact Book – Fiscal Year 2017" (2018), at 10, https://s22.q4cdn.com/104708849/files/doc_factbook/Tyson-Foods-FY17-Fact-Book-(rev-042518).pdf ("Tyson 2017 Fact Book"); 2018 GAO Report at 5.

[56] RTI International, "GIPSA Livestock and Meat Marketing Study, Vol. 3: Fed Cattle and Beef Industries," prepared for U.S.D.A. Grain Inspection, Packers and Stockyard Administration (2007), at 5-4, https://www.gipsa.usda.gov/psp/publication/livemarketstudy/LMMS_Vol_3.pdf ("RTI International").

[57] *Id.*

[58] David Cooper, "Feed yard data reveals higher death losses," PROGRESSIVE CATTLEMAN (Dec. 24, 2015), https://www.progressivecattle.com/topics/herd-health/feedyard-data-reveals-higher-death-losses.

[59] RTI International at 5-4.

138.    That risk and the leverage it provides to Defendants is exacerbated by the significant information asymmetry faced by producers vis-à-vis Defendants regarding the available supply of fed cattle and Defendants' procurement needs. Producers have only limited information concerning the supply of fed cattle beyond the information conveyed by the USDA's Cattle on Feed Reports. By contrast, Defendants can construct detailed inventories of upcoming fed cattle supplies through their regular contacts with all the fed cattle producers situated within their respective procurement territories.

139.    The impact of market access risk on the parties' relative bargaining power is meaningful. As demonstrated by Defendants' threats regarding 2018's supposed "wall of cattle," the mere use of coordinated threats of increased market access risk can be sufficient to coerce producers to commit cattle to captive supply agreements or accept lower cash prices.

## IV.    There Are Many Trade Organizations and Opportunities for Defendants to Meet and Collude.

140.    Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations, including: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation ("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB") and the North American Meat Institute ("NAMI").

141.    For example, the NCBA holds an annual convention (known as "CattleCon"),
a summer conference, a legislative conference, and regional meetings.[60] The NCBA
Product Council, which includes Defendants, other packers, and certain retailers and
restaurants, meets quarterly for the Beef Executive Forum, an invitation-only event.[61]

142.    Similarly, the USMEF – a trade association that develops export opportunities
for U.S. protein producers and whose leadership includes current and former employees
and officers of Defendants – holds both spring and fall conferences and monthly
international trade shows.[62]

143.    The NAMI – which is a national trade association that represents companies
that process 95% of red meat – conducts a series of annual conference and educational
workshops across the country.[63]

## V. Defendants Benefit from High Barriers to Entry.

144.    Defendants benefit from substantial barriers to entry into the market. Because
of these barriers, the entry of new fed cattle slaughter businesses, or the repurposing of

---

[60] NCBA Allied Industry Membership, NAT'L CATTLEMEN'S BEEF ASS'N (2019),
www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20Brochure.
pdf; https://us13.campaign-archive.com/?u=3ac0220907d479b33ff07dbbc&id=1d27f4a1b7.

[61] Id.

[62] See https://www.usmef.org/usmef-events/.

[63] See About NAMI, NAT'L AM. MEAT ASS'N (2019),
https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; Events, NAT'L AMERICAN MEAT
ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

existing cow and bull slaughter facilities, is unlikely despite any decrease in the price of fed cattle or increase in the wholesale price of beef. Construction of large-scale fed cattle packing facilities require an upfront investment of over $250 million and take years to get online due to permitting, planning, designing and building requirements.[64]

145.    The construction of smaller plants, with capacity to slaughter 1,000-1,500 head per day, takes a similar period of time and costs at least $150 million.[65] Re-purposing an existing plant, or reopening a similar sized, but previously shuttered, plant costs many millions of dollars.

146.    Aside from the costs and time associated with opening a plant, new entrants face difficulties complying with a significant volume of regulations, finding and training a workforce of between 1,500 to 3,000 staff, and finding marketing outlets for the resultant beef.

147.    Given these substantial barriers, it's unsurprising recent years have seen the failure of new or re-launched independent fed cattle Packer businesses, including Northern Beef Packers and Kane Beef.[66]

---

[64] *U.S. v. JBS*, Amended Complaint, ¶41.

[65] Amanda Ranke, "What's the Future For Northern Beef Packers?" Beef (July 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers; Press Release.

[66] Amanda Radke, "What's the Future for Northern Beef Packers?" Beef (July 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers; Dirk Lammers, "Aberdeen beef plant open again and slaughtering" CAPITAL JOURNAL (Nov. 19, 2018), www.capjournal.com/news/aberdeen-beef-plant-open-again-and-slaughtering-cattle/article_b0a76552-8f0b-11e5-aab0-4747ca2759bc.html; Greg Henderson, "Kane Beef Now under Court Receivership," DROVERS (Oct. 16, 2018), www.drovers.com/article/kane-beef-now-under-court-receivership.

## DEFENDANTS HAVE SIMILAR COST STRUCTURES AND HAVE SIGNIFICANT OVERSIGHT OF EACH OTHER'S PRICE AND PRODUCTION DECISIONS

148.    Because of their similar cost structures, Defendants have a common interest in manipulating the meat margin to extract increased profits from their existing market shares.

149.    Defendants' field buyers' weekly trips to inspect feedlots in their territory provide an opportunity to meet and exchange commercially sensitive information. On information and belief, field buyers routinely share "market color" obtained from the field, including reports of their competitors' activities obtained from producers, with their respective head offices and fellow field buyers through daily conference calls.

150.    These realities, combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and planned output, enable Defendants to monitor each other's adherence to any anticompetitive agreement. The purchasing dynamics of the fed cattle market, with its weekly cash trade, also provide Defendants with the ability to punish any suspected non-compliance with such an agreement.[67]

---

[67] Research shows that markets, such as the fed cattle market, where many sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for purchasers to agree, sustain and enforce market sharing arrangements. *See, e.g.,* "Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For," U.S. DOJ, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm.

## DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION

151.    Defendants' conduct is consistent with their previous use of production restraint to increase the price of broiler chicken and pork. JBS and Tyson have significant market shares in both the broiler chicken and pork processing markets. Cargill was the fourth largest U.S. pork processer until it sold its pork business to JBS in October 2015.

152.    Broiler chicken and pork processers, including JBS and Tyson, are alleged to have engaged in a series of synchronized production cuts or restrictions designed to raise wholesale prices. The broiler chicken processors have also allegedly manipulated the "Georgia Dock" price benchmark – a self-reported benchmark commonly used by market participants to set wholesale chicken prices.

153.    In both cases, like here, the participants publicly called on each other to maintain supply discipline.

154.    Government investigations[68] and civil litigation[69] regarding the processers' alleged conspiracies are ongoing. At least one defendant, Fieldale Farms, opted to settle with plaintiffs in the broiler class claims.[70]

---

[68] The Antitrust Section of the Florida Attorney General's office opened an investigation into the broiler chicken processors' alleged anticompetitive practices, and the Georgia Department of Agriculture has suspended the Georgia Dock price index.

[69] *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill.) and *In re Pork Antitrust Litig.*, 18-cv-1776 (D. Minn). In the former case, the court held that the broiler chicken processors' customers had alleged sufficient facts to plausibly suggest that defendants' conduct was the product of a conspiracy. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ("Defendants' business strategies during the relevant time period are indicative of a conspiracy.").

[70] *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill.), Nov. 16, 2018, Docket #1414.

155.    In addition, Defendants have a long history of other misconduct, spanning breaches of the Packers & Stockyards Act as well as antitrust, anti-corruption, environmental, health and safety regulation, both domestic and foreign.

### IN ADDITION TO CONSPIRING TO DEPRESS FED CATTLE PRICES, DEFENDANTS MANIPULATED THE MARKET FOR LIVE CATTLE FUTURES AND OPTIONS

156.    Live cattle futures have traded on the CME since 1964. Live cattle options have traded on the CME since 1984.[71] Both contracts, which are important tools used by producers to manage the risks associated with their businesses, were impacted by Defendants' conspiracy.

### I.   Futures and Options Generally.

162.    A commodity futures contract is a standardized bilateral agreement for the purchase and sale of a commodity – like fed cattle – at a specified time. In this context, a commodity is the underlying product on which a futures contract is based.

163.    A futures contract involves an exchange (in this case, the CME) acting as a central clearinghouse that guarantees both sides of the transaction, thereby eliminating counterparty risk. The buyer of a futures contract is typically considered a "long," whose position will increase in value as the underlying physical or cash market price increases. The seller of a futures contract is typically considered a "short" whose position will increase in value as the underlying physical or cash market price decreases.

---

[71] *Historical First Trade Dates*, CME, https://www.cmegroup.com/media-room/historical-first-trade-dates.html.

164.    Rather than take delivery, futures market participants almost always "offset" their futures contracts before actual delivery. For example, a purchaser of one live cattle futures contract may liquidate, cancel, or offset a future obligation to take delivery of the cattle by selling one live cattle futures contract. The difference between the initial purchase price and the subsequent sale price represents the realized profit or loss for the trader.

165.    An options contract comes in two forms: a "call option" and a "put option." The buyer of a call option has the right (but not the obligation) to purchase the underlying asset at a set price (the "strike price"). The seller of the call option (the "writer") has the obligation to deliver the underlying asset at the strike price if the buyer exercises its right. The buyer of a put option has the right (but not the obligation) to sell the underlying asset at a set price (the "strike" or "exercise" price). The seller of a put option has the obligation to buy the underlying asset at the strike price if the buyer exercises its right.

**A. Live Cattle Contracts**

166.    When fed cattle have reached slaughter-weight, they are referred to as "live," "finished," or "fat" cattle. Fed cattle can be distinguished from "feeder cattle", which refers to fed cattle that weigh between 700-900 pounds and have yet to enter the feedlot. Live cattle, for purposes of CME live cattle futures contracts, weigh no less than 1,050 pounds and no more than 1,550 pounds (or 1,350 pounds for heifers).

167.    Trading in CME live cattle futures and options is subject to the rules and regulations of the CME, including Chapter 101[72] (live cattle futures), Chapter 101A[73] (options on live cattle futures), and Chapter 101B[74] (options on live cattle futures calendar spreads) of the CME Rulebook.

168.    CME live cattle futures and options are traded electronically on CME's Globex electronic trading platform. While both live cattle futures and options were also traded in CME's "open outcry" trading pits at the beginning of the Class Period, only live cattle options continued to be so traded after the CME's decision to close down most of its futures trading pits in July 2015.

### 1. Live Cattle Futures

169.    Chapter 101 of the CME Rulebook sets forth the rules for trading in CME live cattle futures–including contract size, trade dates, and tick sizes–as well as deliveries on CME live cattle futures contracts, including, for example, weight deviations, location differentials, and delivery points.

170.    One live cattle futures contract calls for the delivery of 40,000 pounds of live cattle producing 65% Choice, 35% Select USDA grade of live steers or live heifers.[75]

---

[72] CME Rulebook, CME, https://www.cmegroup.com/rulebook/CME/ ("CME Rulebook"), Chapter 101.

[73] CME Rulebook, Chapter 101A.

[74] CME Rulebook, Chapter 101B.

[75] CME Rulebook, Chapter 101, Rules 10101, 10102.B.

171.    Live cattle futures prices are quoted in cents per pound. The minimum tick size is $0.00025 per pound (or $10 per contract).[76] A one penny ($0.01) change in the per pound price results in a $400 change in the contract price.

172.    Live cattle futures trade for the following contract months: February, April, June, August, October, and December. Nine contract months are eligible for trading at any given time. They include the six upcoming contract months and the next three contract months in the calendar cycle.[77] For example, in May 2019, the following contract months were eligible for trading: June 2019, August 2019, October 2019, December 2019, February 2020, April 2020, June 2020, August 2020, and October 2020. Trading continues until the last business day of the given contract month at 12:00 p.m.[78]

173.    Live cattle futures are "physically" settled. This means the buyer of a live cattle future has a right to receive (and the seller of a live cattle future has the obligation to deliver) 40,000 pounds of cattle per contract.[79]

174.    Buyers choose either live graded deliveries or carcass graded deliveries.[80]

---

[76] Live Cattle Futures Contract Specs, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contract_specifications.html.

[77] Live Cattle Futures Quotes, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_quotes_globex.html.

[78] *See id.*

[79] *Self-Study Guide to Hedging with Livestock Futures and Options*, CME, (Version 17), at 7, https://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_GuideNYMEX.pdf.

[80] CME Rulebook, Chapter 101, Rules 10103.B (live graded), 10103.C (carcass graded).

Deliveries of live cattle are made at approved delivery points at approved livestock yards in the following territories: Colorado; Iowa/Minnesota/South Dakota; Kansas; Nebraska; Texas/Oklahoma/ New Mexico.[81] Buyers electing carcass graded delivery must specify an approved slaughter plant enumerated by the CME. Eligible slaughter plants include those enumerated for the livestock yards to which the cattle were tendered, and any other approved slaughter plant that is within 225 road miles of the originating feedlot.

175.    A live delivery unit must consist entirely of steers or entirely of heifers.[82] All cattle are required to be healthy,[83] and all cattle must be born and raised exclusively in the United States.[84]

### 2.  Live Cattle Options

176.    Chapter 101A of the CME Rulebook outlines the specifications for live cattle options. The asset underlying a live cattle option is a live cattle futures contract. A live cattle option permits the holder to buy, in the case of the call, or to sell, in the case of the put, one live cattle futures contract. Live cattle options trade in cents per pound. The minimum price fluctuation is $0.00025 per pound.[85]

---

[81] *Id.*, Rule 10103.B.

[82] *Id.*

[83] *Id.*

[84] *Id.* Rule 10101.

[85] Live Cattle Options Contract Specs, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contractSpecs_options.html.

177.   Live cattle options trade in the following contract months: February, April, June, August, October, and December. At any given time, ten contract months trade, the six months in the February bi-monthly cycle, plus the three next in that cycle in the following year, as well as one nearby "serial" month of January, March, May, July, September, or November. Trading in live cattle options ends on the first Friday of the contract month at 1:00 p.m.[86]

178.   For monthly options that expire in the February bi-monthly cycle (i.e., February, April, June, August, October, and December), the underlying futures contract is the futures contract for the month in which the option expires. For example, the contract for an option that expires in February is the February futures contract.[87]

179.   For monthly options that expire in months other than those in the February bi-monthly cycle (i.e., January, March, May, July, September, and November), the underlying futures contract is the next futures contract in the February bi-monthly cycle that is nearest to the expiration of the option. For example, the underlying futures contract for an option that expires in January is the February futures contract.

180.   Live cattle options are "American style," meaning that the option holders can exercise their options at any point before trading expires.[88]

---

[86] *Id.*

[87] CME Rulebook, Chapter 101A, Rule 101A01.D.

[88] *Id.*, Rule 101A02.A.

181.     In addition, CME lists "live cattle calendar spread options," where the option
is to buy (a call), or to sell (a put), one live cattle futures calendar spread.[89] A live cattle
futures calendar spread option consists of a combination of a purchase in one futures
contract month and a sale in another futures contract month.[90] Unlike American style
options, these options can only be exercised on the day of expiration.[91]

## II. Relationship Between Live Cattle Futures and Cattle Spot (Cash) Prices.

182.     There is a strong relationship between live cattle futures and the fed cattle cash
market. As CME observes, "livestock cash prices and futures prices tend to move up and
down together, which is what makes the concept of effective hedging possible."[92]

183.     The CME recognizesd, livestock (including live cattle and feeder cattle)
contract specifications are designed to ensure "a two-way relationship between the
benchmark livestock futures market and the numerous livestock cash markets. The price
that is discovered in a futures market comes from the interaction between the supply
(sellers' offers) and demand (buyers' bids)."[93]

---

[89] CME Rulebook, Chapter 101B, Rule 101B01.

[90] *Id.*

[91] *Id.*, Rule 101B02.

[92] *INTRODUCTION TO LIVESTOCK: Learn about Basis: Livestock, CME, available at* https://www.cmegroup.com/education/courses/introduction-to-livestock/learn-about-basis-livestock.html.

[93] *Self-Study Guide to Hedging with Livestock Futures and Options*, CME (Version 17), at 6, available at https://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_GuideNYMEX.pdf.

184.    Many futures market "bids and offers come from cash market participants."[94]

185.    "In turn, the futures contract price is then used by cash market participants to transact in the spot (current) market or for cash forward type contracts."[95] The relationship between the cash market and the futures market is particularly strong with respect to live cattle futures because, as the CME has observed, "many cash market contracts are 'based on' or 'referenced to' the futures market price."[96]

186.    Live cattle futures contracts are designed so that their prices converge with physical cash cattle prices when they expire. For physically settled contracts such as live cattle, "[t]he possibility of delivery on the futures contract generally causes the futures price during the delivery month to align with the cash price at the futures delivery locations."[97]

187.    There is a strong, statistically-significant relationship between: (1) changes in the physical cash cattle prices reported in the afternoon of day 1 with live cattle futures market price changes on day 2; (2) changes in physical cash cattle prices reported on day 2 and live cattle futures market price changes on day 2; and (3) changes in live cattle futures market prices on day 2 and physical cash market prices changes reported on the morning of day 3.

---

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.* at 11.

### III.   Defendants Traded CME Live Cattle Futures and Options.

188.   Defendants regularly trade on the CME live cattle markets.

189.   From February 1, 2018 through January 31, 2019, for example, Defendants had the only CME-approved slaughter plants for live cattle.[98] As a result, they are central participants in the CME live cattle market.

190.   Cargill touts its ability to "manage risk" in live and feeder cattle futures and options contracts. "Our risk management team has more than 20 years of experience helping customers manage price risks across 70-plus commodities markets" including "Live cattle" and "Feeder cattle."[99] News reports indicate it actively trades in the cattle futures markets. For example, on January 25, 2016, Cargill stated, "We've seen not only a very volatile cattle futures market, but prices were coming down a lot."[100]

191.   Tyson uses "derivative financial instruments, primarily futures and options, to reduce our exposure to various market risks related to commodity purchases,"[101] as well as "to reduce the effect of changing prices and as a mechanism to procure the underlying

---

[98] CME Group, *Chicago Mercantile Exchange Inc.* 2018 Approved Slaughter Plants for Live Cattle, https://www.cmegroup.com/content/dam/cmegroup/notices/market-regulation/2018/01/2018-approved-slaughter-plants-for-live-cattle.pdf.

[99] Cargill, *Agriculture Risk Management*, https://www.cargill.com/price-risk/crm/agriculture.

[100] Gregory Meyer, *Cattlemen lock horns with futures exchange over market volatility*, FINANCIAL TIMES (Jan. 25, 2016), https://www.ft.com/content/6eed1268-c130-11e5-846f-79b0e3d20eaf (subscription required).

[101] Tyson Foods, Inc., Quarterly Report (Form 10-Q) at 37 (Feb. 4, 2011), https://www.sec.gov/Archives/edgar/data/100493/000119312511024082/d10q.htm.

commodity...."[102] Tyson holds "certain positions, primarily in ... livestock futures, that are not hedges for financial reporting purposes."[103] "As part of our commodity risk management activities, we use derivative financial instruments, primarily futures and options, to reduce our exposure to various market risks related to these purchases...."[104]

192.    JBS references the CME live cattle futures contract in its procurement contracts.[105] Its financial reports also indicate a high level of commodities, derivatives and futures trading.[106]

193.    Marfrig likewise acknowledges that it trades "futures market derivative financial instruments" to "reduce commodity-related price risk."[107]

194.    National Beef has similarly acknowledged it uses "futures contracts in order to reduce exposure associated with entering into firm commitments to purchase live cattle at prices determined prior to the delivery of the cattle...."[108]

---

[102]    Tyson Foods, Inc., Annual Report (Form 10-K) at 8 (Sept. 29, 2018), https://s22.q4cdn.com/104708849/files/doc_financials/quartely/2018/q4/TSN-FY18-10-K.pdf.

[103]    *Id.* at 14.

[104]    *Id.* at 52.

[105]    *Driftless Region Beef Conference 2013*, Sample Contract, https://lib.dr.iastate.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1034&context=driftlessconference.

[106]    JBS S.A., Condensed Financial Statements and Independent auditors' report, at 46 (Sept. 30, 2018), https://jbss.infoinvest.com.br/enu/4812/DF%20JBS%20300918%20Ingls%20-%20Condensada%2013.11%2018h20_Parecer.pdf.

[107]    Marfrig Global Foods, 2017 Sustainability Report at 77, http://www.marfrig.com.br/Uploads/Arquivos/Marfrig_RA17_eng.pdf.

[108]    National Beef Annual Report (Form 10-K) at F-15, (Nov. 16, 2011), https://www.sec.gov/Archives/edgar/data/1273784/000144530511003450/nbp201182710k.htm.

195.    The specifics of Defendants' CME cattle futures and options trading activity are not public information. Trading on the CME is anonymous.

## IV. Defendants Directly Caused Artificial CME Live Cattle Futures and Options Prices

196.    Because slaughter-weight fed cattle is the commodity underlying CME live cattle futures and options, Defendants necessarily and directly caused prices of live cattle futures and options to be artificial by suppressing the price of fed cattle.

197.    Defendants had the motive to cause artificial depression of futures prices, separate and apart from their futures transactions. In particular, futures prices are used to set the price of cattle delivered under forward contracts. By depressing live cattle futures contracts Defendants lower the cost of cattle procured under forward contracts.

198.    Defendants' conduct in the cash cattle market had a direct and proximate impact on prices in the CME live cattle futures and options markets. For example, on August 14, 2015, Tyson announced it was closing its Denison, Iowa beef plant, which caused price declines in the cash and futures markets. Specifically, the spot or front-month August contract fell $0.004 per pound ($160 per live cattle future) and the October 2015 contract fell $0.01 per pound ($400 per live cattle future). According to one market participant, "[s]ome feedlots may have surrendered after seeing futures fall earlier in the session, partly on word that Tyson closed a beef plant."[109]

---

[109] Theopolis Waters, *Livestock-CME live cattle futures sag with initial cash prices*, REUTERS, Aug. 14, 2015, https://www.reuters.com/article/markets-livestock-cattle/livestock-cme-live-cattle-futures-sag-with-initial-cash-prices-idUSL1N10P2MG20150814.

CLASS ACTION ALLEGATIONS

199.    Plaintiff brings this action on behalf of himself, and, under Rules 23(a) and (b)

of the Federal Rules of Civil Procedure, on behalf of all members of the following two

classes:

**Producer Class**
All persons or entities within the United States that directly sold to a
Defendant one or more fed cattle for slaughter during the Class Period
other than on a cost-plus basis.

**Exchange Class**
All persons who transacted in live cattle futures and/or options traded on
the CME or another U.S. exchange during the Class Period.[110]

200.    "Fed cattle" means steers and heifers, whether beef breeds or Holsteins, which

are raised and fed specifically for beef production. "Class Period" means the period from

January 1, 2015 through the present. "Cost-plus basis" means an agreement to sell fed

cattle at a price determined by the producers' costs of production without regard to

prevailing cash cattle prices.

201.    Excluded from both Classes are Defendants and their officers, directors,

management, employees, subsidiaries, and affiliates. Also excluded is the Judge

presiding over this action, his or her law clerks, spouse, and any person within the third

degree of relationship living in the Judge's household and the spouse of such a person.

---

[110] The Exchange Class includes persons who established positions before the Class period but who closed
out or stood for delivery on these positions after the Class Period commenced. As noted below, Plaintiffs
reserve the right to amend the Class definitions as the litigation progresses to include, for example, all
persons who transacted in CME feeder cattle futures and options during the Class Period.

202.    Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Members of the Producer Class are readily identifiable from information and records in the possession of Defendants or third parties (including commercial feedlots and marketing cooperatives engaged by certain Class members). Members of the Exchange Class are readily identifiable from information and records in the possession of the CME, or capable of identification via third parties.

203.    Plaintiffs' claims are typical of the claims of the members of both Classes. Plaintiffs and members of both Classes were damaged by the same wrongful conduct of Defendants.

204.    Plaintiffs will fairly and adequately protect and represent the interests of members of both Classes. The interests of Plaintiffs are coincidental with, and not antagonistic to, those of members of the Classes. Plaintiffs and all members of the Producer Class are similarly affected by Defendants' wrongful conduct in that they received artificially low prices for fed cattle sold to Defendants. Plaintiffs and all members of the Exchange Class are similarly affected by Defendants' course of conduct, which violated the Commodity Exchange Act.

205.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of antitrust, class action, and other complex litigation, including multiple class actions in the agricultural industry on behalf of farmers.

206. Questions of law and fact common to the Classes predominate over questions that may affect only individual Class members, thereby making relief with respect to members of both Classes as a whole appropriate.

207. Questions of law and fact common to members of the Producer Class include, but are not limited to:

a. whether Defendants engaged in a combination and conspiracy among themselves to fix, depress, suppress, and/or stabilize the prices of fed cattle purchased in the United States;

b. whether Defendants engaged in a combination and conspiracy among themselves to allocate the market for the purchase of fed cattle offered for sale in the United States;

c. the identity of the participants of the alleged conspiracy;

d. the duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

e. whether Defendants' alleged conspiracy violated federal antitrust laws;

f. whether Defendants' alleged conspiracy and/or course of business violated the Packers and Stockyards Act;

g. whether Plaintiffs and members of the Producer Class suffered injury;

h. the amount of damages suffered by Plaintiffs and members of the Producer Class; and

i. the appropriate type and scope of injunctive and related equitable relief available to the Producer Class.

208. Questions of law and fact common to members of the Exchange Class include, but are not limited to:

a. whether Defendants' conduct violated Sections 6(c)(3), 9(a) and 22 of the Commodity Exchange Act;

b. whether Defendants' conduct violated Sections 6(c)(1) and 22 of the Commodity Exchange Act;

c. whether Defendants aided and abetted Commodity Exchange Act violations;

d. whether Plaintiff and members of the Exchange Class suffered injury;

e. the amount of damages suffered by Plaintiff and members of the Exchange Class and

f. the appropriate type and scope of injunctive and related equitable relief available to the Exchange Class.

209. A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. A class action will permit many similarly-situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to

67

litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

210.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

211.    Plaintiffs have defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Classes, including, without limitation, the length of the Class Period.

## STATUTE OF LIMITATIONS AND TOLLING

212.    The statutes of limitations governing Plaintiffs' claims against Defendants were tolled under the doctrine of fraudulent concealment. The doctrine applies here because Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

213.    Defendants actively concealed their violations of law from Plaintiffs and both Classes by, amongst other matters, (i) relying on non-public forms of communication; (ii) offering pre-textual justifications for their plant closures, slaughter reductions and withdrawal from the cash cattle trade; (iii) explicitly and implicitly representing that the fed cattle bids and contract terms Defendants offered Plaintiffs and the Producer Class were the product of honest competition and not a conspiracy; and (iv) affirmatively

misrepresenting that they complied with applicable laws and regulations, including

antitrust laws. Below is a list of non-exhaustive examples of such statements that each

Defendant published during the Class Period:

a.   Tyson's Code of Conduct extolled Tyson's compliance with antitrust laws

throughout the Class Period. Tyson states that it "compete[s] in the market with integrity

and compl[ies] with competition laws.... We comply with the letter and spirit of

competition laws ... wherever we do business."[111]

b.   JBS's 2014 Annual Report detailed the policies it had in place to "ensure ethical

conduct and integrity in the management of its business", including its Manual of Ethical

Conduct, which "addresses issues related to violations, conflicts of interest, third-party

contracts, employment practices, receiving gifts, decision making, anti-corruption

practices and other sensitive topics."[112] JBS also launched an "Always Do The Right

Thing" compliance program in June 2017 to "ensure that JBS implements the best global

compliance program in the industry in order to restore the trust of its stakeholders."[113]

---

[111]   Tyson   Code   of   Conduct,   available   at   https://www.tysoncodeofconduct.com/suppliers-and-customers/competition (last accessed May 6, 2019).

[112] JBS 2014 Annual Report at 45 – 46, available at
https://jbss.infoinvest.com.br/enu/4362/20150601_RelatorioJBS_ingles_menor.pdf (last accessed May 6, 2019).

[113] Available at https://jbss.infoinvest.com.br/enu/4197/JBS%20S.A.%20-%20Material%20Fact%20-%20Executive%20Committee2.pdf (last accessed May 6, 2019).

c.   Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built.... We conduct our business with integrity.... We compete vigorously, but do so fairly and ethically. We ... comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reiterated this message in its subsequent Corporate Responsibility reports and on its website.[114]

d.   National Beef's former majority shareholder, Jefferies Financial Group, Inc. noted in its 2014 Annual Report that National Beef was "subject to extensive government regulation" and was subject to the Packers and Stockyards Act.

210.   Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants conspired to fix prices in the fed cattle market, their conspiracy could not have continued for as long as it did. Accordingly, Plaintiffs could not have learned of Defendants' anticompetitive conduct until recently.

211.   Because of Defendants' fraudulent concealment, Plaintiffs and both Classes were not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until recently. Plaintiffs and members of both Classes have acted diligently in seeking to bring their claims promptly.

---

[114] *See* "Ethics & Compliance" https://www.cargill.com/about/ethics-and-compliance (last accessed May 6, 2019).

212.    Accordingly, Plaintiffs assert that the applicable statutes of limitation on Plaintiffs' claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

213.    Additionally, Defendants' conspiratorial conduct has caused and continues to cause continuing injuries to Plaintiffs and the Classes. To the extent any statute of limitations was previously triggered – which is expressly disputed – these continuing injuries constitute continuing violations that start any statutory period running again.

CLAIMS FOR RELIEF

COUNT I: MARKET ALLOCATION AND PRICE-FIXING
IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1
(Producer Class against All Defendants)

214.    Plaintiffs incorporate by reference each prior paragraph as if set forth herein.

215.    During the Class Period, Defendants controlled the slaughter of fed cattle in the United States and thus the available marketing outlets for fed cattle producers. Defendants were horizontal competitors in the market for the purchase of fed cattle.

216.    From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants engaged in a continuing agreement, understanding and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix and suppress the price of fed cattle in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. Defendants' conspiracy is a per se violation of the Sherman Act and is, in any event, an unreasonable and unlawful restraint of trade.

217.    Defendants' conspiracy and the resulting impact on fed cattle prices received

by producers occurred in and affected U.S. interstate commerce.

218.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and members

of the Producer Class have suffered injury to their business or property. These injuries

included, but were not limited to, receiving artificial and non-competitive prices for fed

cattle sold to Defendants. Plaintiffs and the Producer Class were also deprived of the

benefits of free and open competition in the market for the purchase of fed cattle.

Plaintiffs and members of the Producer Class are each entitled to treble damages for

Defendants' violations of the Sherman Act alleged herein.

219.    Plaintiffs and the members of the Producer Class are threatened with future

injury to their businesses and property unless the injunctive relief requested is granted.

### COUNT II: VIOLATIONS OF PACKERS AND STOCKYARDS ACT, 7 U.S.C. §§192 and 209
### (Producer Class against All Defendants)

210.    Plaintiffs incorporate by reference each prior paragraph as if set forth herein.

211.    Title 7 U.S.C. §192 provides, in pertinent part, "[i]t shall be unlawful for any

packer with respect to livestock . . . to . . . (a) [e]ngage in or use any unfair, unjustly

discriminatory, or deceptive trade practice or device; or . . . (e) [e]ngage in any course of

business or do any act for the purpose or with the effect of manipulating or controlling

prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any

article, or of restraining commerce; or (f) [c]onspire, combine, agree, or arrange with any

other person (1) to apportion territory for carrying on business, or (2) to apportion

purchases or sales of any article, or (3) to manipulate or control prices; or (g) [c]onspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e)."

212.    Title 7 U.S.C. §209 further provides that, "[i]f any person subject to this chapter violates any of the provisions of this chapter . . . relating to the purchase, sale, or handling of livestock, . . . he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation." Such liability may be enforced "by suit in any district court of the United States of competent jurisdiction[.]"

213.    Deceptive trade practices under the Packers and Stockyards Act are addressed in the Code of Federal Regulations in Part 201 of Title 9. Section 201.70 states "[e]ach packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."

214.    From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants violated 7 U.S.C. §192(a), (e), (f), and (g) by engaging in a course of business and doing acts for the purpose or with the effect of reaching and implementing a conspiracy, combination, agreement, or arrangement to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle.

215.     The effect of these acts and this conspiracy, combination, agreement, or arrangement, was to fix, depress, suppress, stabilize, or otherwise artificially manipulate the price of fed cattle bought by Defendants. Defendants had no legitimate business justification for these acts and this conspiracy, combination, agreement, or arrangement.

216.     As a proximate result of Defendants' breaches of the Packers and Stockyards Act, Producer Plaintiffs and the members of the Producer Class have been injured and damaged in their respective businesses and property.

### COUNT III: UNJUST ENRICHMENT
### (Producer Class against All Defendants)

217.     Plaintiffs incorporate by reference each prior paragraph as if set forth herein.

218.     Plaintiffs and Producer Class members sold fed cattle during the Class Period directly to Defendants. These transactions should have been priced based on competitive market forces and reflect honest competition by Defendants.

219.     However, rather than competing honestly and aggressively with each other, Defendants colluded to fix, depress, suppress, or stabilize the prices paid to Plaintiffs and the Producer Class for the purchase of their fed cattle.

220.     Defendants' collusion enabled them to enjoy supra-competitive profits at the expense of Plaintiffs and the Producer Class and caused Plaintiffs and the Producer Class to receive less for sales of fed cattle to Defendants than they otherwise would have received had Defendants acted honestly and fairly.

221.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and the Producer Class, and equity and good conscience require Defendants to make restitution.

222.    Plaintiffs and the Producer Class therefore seek restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

## COUNT IV: MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT 7 U.S.C. §§1, ET SEQ. AND CFTC REGULATION 180.2, 17 C.F.R. §180.2 (Exchange Class against All Defendants)

223.    Plaintiff Mendenhall Farms incorporates by reference each prior paragraph as if set forth herein.

224.    During the Class Period, Defendants specifically intended to manipulate the prices of fed cattle, the physical commodity underlying the CME live cattle futures and options contracts, and specifically intended to manipulate the prices of CME live cattle futures and options.

225.    Defendants had the ability to cause artificial prices in fed cattle and live cattle futures and options. They did so through, among other things, their dominant position in the market for the purchase of fed cattle, their superior access to information and reporting mechanisms, their financial wherewithal, and their extensive involvement in the CME live cattle futures and options trading and delivery processes.

226.    Defendants caused artificial prices in the physical fed cattle market as well as in live cattle futures and options markets. Their conduct resulted in, among other things,

artificially low prices in the commodity underlying CME live cattle futures and options prices and in the live cattle futures and options prices themselves.

227.    Defendants therefore engaged in unlawful manipulation of CME live cattle and futures and options and their underlying physical commodity in violation of Sections 6(c)(3), 7 U.S.C §9(3), 9(a) of the CEA, 7 U.S.C. §13(a), Section 22 of the CEA, 7 U.S.C. §25(a), and CFTC Rule 180.2, 17 C.F.R. §180.2.

228.    The manipulation by Defendants and their conspirators and agents deprived Plaintiff Mendenhall Farms and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices, which directly led to injury and economic damages.

229.    Plaintiff Mendenhall Farms and Exchange Class members are each entitled to actual damages and other relief from Defendants.

### COUNT V: MANIPULATIVE AND DECEPTIVE DEVICE IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, ET SEQ. AND CFTC REGULATION 180.1(A), 17 C.F.R. §180.1(A) (Exchange Class against All Defendants)

210.    Plaintiff Mendenhall Farms incorporates by reference each prior paragraph as if set forth herein.

211.    Defendants intended to affect or acted recklessly with regards to affecting prices of CME live cattle futures and options contracts and engaged in overt acts in furtherance of that intent.

212.    Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud, and engaged in acts, practices, and/or courses of business that operated as a fraud or deceit in violation of Section 6(c)(1) of the CEA, 7 U.S.C. §9, and Section 22 of the CEA (7 U.S.C. §25), and Regulation 180.1(a), 17 C.F.R. §180.1(a).

213.    Defendants' conduct proximately caused injury to Plaintiff Mendenhall Farms and other members of the Exchange Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

214.    The manipulative and deceptive devices employed by Defendants and their conspirators and agents deprived Plaintiff Mendenhall Farms and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices that directly led to injury and economic damages.

215.    Plaintiff Mendenhall Farms and Exchange Class members are each entitled to actual damages and other relief from Defendants.

## COUNT VI: PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§ 1, ET SEQ. AND CFTC REGULATION 1.2, 17 C.F.R. §1.2
### (Exchange Class against All Defendants)

216.    Plaintiff Mendenhall Farms incorporate by reference each prior paragraph as if set forth herein.

217.    Defendants' traders, employees and/or officers, and conspirators, acted as agents for their principals, Defendants, when engaging in the manipulation and manipulative and deceptive devices and schemes described herein.

218.    Defendants are liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2, for the manipulative acts of its agents, representatives, and/or other persons acting for them in the scope of their employment.

219.    The principal-agent violations by Defendants and their conspirators and agents deprived Plaintiff Mendenhall Farms and the Exchange Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices that directly led to injury and economic damages.

220.    Plaintiff Mendenhall Farms and Exchange Class members are each entitled to actual damages and other relief from Defendants.

## COUNT VII: AIDING AND ABETTING IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, ET SEQ.
### (Exchange Class against All Defendants)

221.    Plaintiff Mendenhall Farms incorporates by reference each prior paragraph as if set forth herein.

222.    Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein, including violations by the other Defendants.

223.    Defendants did so knowing of their violations of the CEA and willfully intended to assist these manipulations, which resulted in CME live cattle futures and options prices, and their underlying physical commodity becoming artificial, during the Class Period.

224.    Through their aiding and abetting violations, Defendants violated Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

225.    Plaintiff Mendenhall Farms and Exchange Class members are each entitled to actual damages and other relief from Defendants.

### PRAYER FOR RELIEF

226.    Plaintiffs, on behalf of themselves and members of the Classes, request relief as follows:

A.  That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that both of the Plaintiffs be named as Class Representative of the Producer Class and Plaintiff Mendenhall Farms be named as Class Representative of the Exchange Class, that the undersigned be named as Lead Class Counsel of both Classes, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.  That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

C.  That the Court award Plaintiffs and members of the Classes damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.  That the Court issue appropriate injunctive and other equitable relief against Defendants;

E.  That the Court award Plaintiffs pre- and post-judgment interest;

F.  That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and

G.  That the Court award any and all such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all matters so triable.

Date: May 22, 2019

Respectfully submitted,

By */s/ Matthew J. Barber*
William R. Sieben (#100808)
Alicia N. Sieben (#389640)
Matthew J. Barber (#397240)
**SCHWEBEL GOETZ & SIEBEN**
5120 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: (612) 377-7777
bsieben@schwebel.com
asieben@schwebel.com
mbarber@schwebel.com

Ward A. Rouse
(pro hac application forthcoming)
**ROUSE LAW, PC**
4940 Pleasant Street
West Des Moines, Iowa 50266
Telephone: (515) 223-9000
wardrouse@rouselaw.us

Richard M. Paul III
Sean Cooper
(pro hac applications forthcoming)
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Rick@PaulLLP.com
Sean@PaulLLP.com

Eric H. Gibbs
Michael L. Schrag
Joshua Bloomfield
George Sampson
(pro hac applications forthcoming)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Telephone: (510) 350-9700
ehg@classlawgroup.com
mls@classlawgroup.com
jjb@classlawgroup.com
gws@classlawgroup.com

**ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASSES**

80
